UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MORRIS ROBERSON,

             Plaintiff,

      v.

HUGHES, et al.,

             Defendants.

Case No. 16-cv-01087-EMC

**ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT**

Docket No. 64

## I.     INTRODUCTION

In this *pro se* prisoner's civil rights action for damages, Morris Roberson complains about prison officials' handling of a disciplinary charge, administrative segregation, and housing decisions. Defendants now move for summary judgment and Mr. Roberson opposes the motion. For the reasons discussed below, Defendants' motion for summary judgment will be granted and judgment entered in their favor.

## II.     BACKGROUND

A.    The Claims For Relief

The Court has found three cognizable due process claims in this action: (1) a claim that hearing officer Meredith violated Mr. Roberson's right to due process at a disciplinary rehearing on September 6, 2012; (2) a claim that Defendants Lopez, Hughes, and Garcia violated Mr. Roberson's right to due process by failing to prevent his transfer to the Corcoran SHU after he informed them that the SHU term was premised on a disciplinary decision that had been set aside; and (3) a due process claim against Defendants Mascarenas and Sandor for failing to release Mr. Roberson from the SHU once he informed them that his SHU term was premised on a disciplinary

1    decision that had been set aside.  *See* Docket No. 17.[1]

2         The second and third claims are based on a sequence of events.  Although there are many

3    details – in part because the division of labor in the California prison system allocates decision-

4    making to a variety of officials -- it helps to have a basic roadmap about the nature of the claims

5    asserted in this case.  The basic sequence of events that unfolded over several months in 2012 is as

6    follows:

7         1.  Mr. Roberson allegedly participated in a riot and was put in administrative

8             segregation that day pending resolution of a disciplinary charge against him;

9         2.  A hearing was held and Mr. Roberson was found guilty of rioting, was assessed a

10            90-day loss of credits, and was referred to the classification committee;

11        3.  The classification committee imposed a 5-month SHU term for the disciplinary

12            offense and an indeterminate SHU term for him being a disruptive inmate (because

13            this was his second rioting offense);

14        4.  The disciplinary decision was vacated and ordered reheard because of a procedural

15            deficiency at the original hearing;

16        5.  A rehearing was held, at which Mr. Roberson again was found guilty of rioting;

17            and

18        6.  Mr. Roberson was then sent to the SHU.

19        Mr. Roberson's theory is basically that, once the original disciplinary decision was

20   vacated, the SHU terms assessed by the classification committee should have been vacated and

21   that it was improper to send him to the SHU without holding a new classification hearing even

22   though he was found guilty at the rehearing on disciplinary charge on which the SHU terms were

23   based.

24

25   _____

     [1] Mr. Roberson attempts to introduce matters outside the scope of this action in his opposition
26   papers.  He states in his declaration that he was put in the behavior management unit on some
     unidentified date, *see* Docket No. 85 at 7, but his evidence shows that that decision was made at a
27   different prison (CSATF) by persons who are not defendants in this action, *see* Docket No. 12 at
     52; Docket No. 85 at 34.  The Court disregards his discussion of his placement in the behavior
28   management unit because the amended complaint does not allege any facts or claim about that
     placement.

B.      The Facts

The following facts are undisputed unless otherwise noted.

1.      The Parties and Relevant Time Period

The relevant time period in this action is from April 22, 2012 through about April 2013, although almost all of the important events happened in 2012.

Mr. Roberson was a prisoner housed at Salinas Valley State Prison until he was transferred to the security housing unit (SHU) at Corcoran State Prison on September 11, 2012.

There are six Defendants remaining in this action. Correctional counselor Hughes, correctional counselor Garcia, and correctional sergeant Lopez worked in the administrative segregation unit at Salinas Valley. Correctional lieutenant Meredith acted as the senior hearing officer at the September 6, 2012, rehearing at Salinas Valley on the rule violation report issued to Mr. Roberson. Correctional counselor Mascarenas reviewed inmate files at Corcoran and made recommendations to classification committees about those inmates, including Mr. Roberson. Defendant Sandor worked as the chief deputy warden at Corcoran during the relevant time, and chaired three of Mr. Roberson's classification committee hearings.

2.      Mr. Roberson's 2011 Rioting Offense

A riot involving about two dozen inmates occurred at Salinas Valley on January 20, 2011. A rule violation report (RVR) was issued to Mr. Roberson, charging him with participating in that riot. Docket No. 79 at 6-9, 15. He was found guilty and assessed a 90-day loss of credits.

3.      The April 22 Riot and the Consequences for Mr. Roberson

A riot occurred on April 22, 2012, at Salinas Valley. According to the Incident Report, 14 inmates were involved, including Mr. Roberson. *Id.* at 29.

On that same day, Mr. Roberson was placed in the administrative segregation unit

///

///

///

///

///

3

(ad-seg).[2] A CDCR-114D[3] was issued to him that day, explaining that he was being placed ad-seg because he and 13 other "Black (Crip) inmates" had been observed by staff fighting in the yard and refusing to get down on the ground when ordered to do so. *Id.* at 31. The CDCR-114D stated: "Due to the aforementioned, your continued presence on Facility 'C' is deemed a threat to the safety and security of the institution, staff, and inmate population. Therefore, you will remain in [ad-seg until] the completion of the RVR/D.A. disciplinary process and administrative review for your future appropriate housing and programming needs." *Id.* The ad-seg placement was approved on April 23 by a facility captain. *Id.*

On April 26, 2012, the Institutional Classification Committee (ICC)[4] met with Mr. Roberson for an initial review of his ad-seg placement. The ICC decided to request a 90-day extension of Mr. Roberson's ad-seg placement to allow time to complete the disciplinary process for Mr. Roberson's participation in the April 22 riot. Docket No. 79 at 32. The ICC thus referred the matter to the classification staff representative (CSR) for approval of the 90-day ad-seg extension. *Id.*[5] The CSR approved the 90-day ad-seg extension. *Id.* at 33.

A rules violation report (RVR) was issued to Mr. Roberson on May 2, 2012, charging him with "participation in a riot" on April 22, 2012. *Id.* at 34. The RVR was written by correctional officer (C/O) Murphy, who described the fighting occurring that day on the yard, including two

---

[2] Placement in ad-seg was authorized in the CDCR's Operations Manual, which provided: "When an inmate's presence in an institution's inmate general population presents an immediate threat to the safety of the inmate or others, endangers institution security or jeopardizes the integrity of an investigation of an alleged serious misconduct or criminal activity, the inmate shall be immediately removed from general population and be placed in AD-SEG." Docket No. 79 at 103 (CDCR DOM § 52080.24); *accord* Cal. Code Regs. tit. 15, § 3335 (as amended through June 10, 2011).

[3] A CDCR-114D is the form number for a form entitled "administrative segregation unit placement notice." The form has a several boxes to check to identify the reasons for an inmate's placement in ad-seg, as well as an area for a narrative of the circumstances that support the reason for the placement in ad-seg. *See, e.g.,* Docket No. 79 at 31.

[4] An ICC determines "appropriate housing placement, work assignments, custody levels, and whether an inmate was fit for a cellmate, among other factors." Docket No. 75 at 2.

[5] The CSR is an independent reviewer who reports to CDCR headquarters in Sacramento. ICC decisions on issues such as transfers and SHU placement must be reviewed and approved by the CSR. Docket No. 75 at 2-4.

inmates kicking a third inmate who was "motionless on the ground while being kicked. Three more inmates, inmates Robinson (F-70309), Roberson (C-83614), and Williams (AE-1790), then ran into the scene and started fighting inmates Brown, Davis, and Richardson." *Id.* Staff gave orders for the inmates to stop, then fired pepper spray and "40MM direct rounds" toward the inmates, who eventually stopped fighting and got down on the ground as ordered. *Id.* at 34-35.

### 4. The Original Hearing On the RVR

An Investigative Employee (IE)[6] was assigned for the RVR. *See* Docket No. 79 at 40. The IE report prepared in May 2012 stated that the IE had informed Mr. Roberson that the IE "will be acting as a fact finder for the Senior Hearing Officer." *Id.* The IE report stated that Mr. Roberson "is requesting photographs of all weapons found on the yard and photographs of all inmates involved. He is also requesting any camera footage found on yard. Inmate ROBERSON also had questions for Inmate witnesses." *Id.* The IE recorded the questions asked of, and the answers given by, two inmate-witnesses Mr. Roberson wanted questioned: those inmates denied fighting with Mr. Roberson and denied that Mr. Roberson was involved in the incident on April 22. *Id.*

On June 1, 2012, a hearing was held on the RVR. (This will sometimes be referred to as the "original hearing," to distinguish it from the September 6, 2012 "rehearing" discussed later.) At the original hearing, Mr. Roberson was found guilty of participating in a riot and was assessed a 90-day loss of credits. *Id.* at 37. He also was "referred to ICC for program review and possible SHU Term Assessment." *Id.*

### 5. Classification Decisions

Under a regulation then in effect, "[a]n inmate whose conduct endangers the safety of others or the security of the institution shall be housed in a SHU. Cal. Code Regs. tit 15, § 3341.5(c) (as amended through April 5, 2012). An inmate may be assigned to the SHU if the "inmate has been found guilty of an offense for which a determinate term of confinement has been

---

[6] A regulation states that an investigative employee "is designated to gather information for the senior hearing officer or disciplinary hearing committee." Cal. Code Regs. tit. 15, § 3318(a). An investigative employee is different from a staff assistant, who is sometimes assigned to help the inmate, *see id.* at § 3318(b), although not in this case.

1   assessed or is deemed to be a threat to the safety of others or the security of the institution." *Id.* at

2   § 3341.5(c)(1). "Assignment to a SHU may be for an indeterminate or for a fixed period of time."

3   *Id.* at § 3341.5(c)(2).

4       A memorandum from CDCR headquarters dated August 26, 2002 -- a decade before the

5   relevant events in this case -- discussed imposing indeterminate SHU terms for "disruptive

6   inmates." Docket No. 80-1 at 9. The memorandum cited § 3341.5(c) as authority, and stated that

7   prison officials could consider indeterminate SHU terms for "inmates who complete a Determinate

8   Security Housing Unit (SHU) term and continue to pose a threat to the safety of others or security

9   of the institution. This perceived threat may be based on the inmate's behavior while in SHU

10  housing or due to the inmate's disciplinary history while housed in the California Department of

11  Corrections." Docket No. 80-1 at 9. One of the "examples of inmates who may qualify for

12  consideration of Indeterminate SHU status" was "inmates who have been . . . assessed two

13  Determinate SHU terms for participation in a riot." *Id.*

14      Custody captain Hughes states in his declaration that in 2012 it was not necessary for there

15  to be a guilty finding on the "RVRs for riots or SHU-able offenses . . . before an inmate was

16  considered for indeterminate SHU placement"; merely being charged was sufficient for an inmate

17  to receive an indeterminate SHU term. Docket No. 68 at 5. The CDCR's Operations Manual

18  provided that, when the inmate was in ad-seg due to a pending disciplinary matter, the

19  classification committee hearing "shall assume the alleged misconduct or criminal activities to be

20  factual as reported in the segregation order." Docket No. 79 at 103 (DOM § 52080.27.1).

21  Custody captain Hughes explains that the administrative decision under § 3341.5(c) as to whether

22  the inmate posed a threat to safety and security "could be made on many factors, including being

23  charged with an RVR. For example, in many cases, inmates will choose to defer a hearing on

24  their RVR until they learn whether the local district attorney plans to prosecute them, because

25  inmates do not want to make incriminating statements in their RVR hearing. In the meantime, the

26  prison has the authority to give those inmates indeterminate SHU terms while they await the

27  district attorney's decision, even though they have not yet been found guilty of the RVR or any

28  new criminal charges." Docket No. 68 at 10.

On June 28, 2012, Mr. Roberson appeared before the ICC again. Docket No. 79 at 43. No defendant participated in this ICC hearing. Mr. Roberson states that, at this hearing, the ICC elected to release him back to the C Yard because the RVR had not yet been completed, but he did not feel comfortable returning to the C Yard because C/O Murphy worked there. Docket No. 16 at 6-7. It is undisputed, however, that he was not released to the C-yard and instead remained in ad-seg. The ICC report for the June 28 hearing noted that the RVR disciplinary process was not yet complete because, although Mr. Roberson had been found guilty, the RVR was awaiting final signatures and awaiting a possible referral to the district attorney for prosecution. Docket No. 79 at 43. The ICC report noted that Mr. Roberson's projected minimum eligible release date (MERD) -- apparently for the SHU term he would get for being found guilty of participating in a riot -- was August 15, 2012; the ICC therefore elected to retain him in ad-seg pending completion of the disciplinary process. *Id.* The CSR approved a 45-day extension in ad-seg to allow completion of the disciplinary process. *Id.* at 44.

On July 13, 2012, another CDCR-114D was issued to Mr. Roberson stating that he was being "retained in [ad-seg] pending ICC review and a possible SHU term assessment/ indeterminate SHU placement." *Id.* at 46.

On July 19, 2012, Mr. Roberson appeared before the ICC. The ICC noted that Mr. Roberson had been found guilty of participating in a riot, "a Division D and SHU-able offense," and elected to impose a 5-month SHU term with a MERD of August 15, 2012, based on Mr. Roberson having been found guilty of participating in a riot. *Id.* at 48. More significantly, the ICC determined that Mr. Roberson had received two SHU terms for participating in two riots within the last two years (i.e., the riot on April 22, 2012, and the riot on January 20, 2011), and he thus met the criteria for indeterminate SHU placement. *Id.* The committee noted that Mr. Roberson's "behavior clearly demonstrates a propensity for Violence and disruptive behavior which endangers the safety of others, as well as the security of the Institution." *Id.* The ICC referred Mr. Roberson to a CSR with a recommendation that he be transferred to the SHU at

Corcoran or Tehachapi[7] "to serve an indeterminate SHU term upon completion of MERD of 8-15-12" on the 5-month SHU term. *Id.* Mr. Roberson was to be retained in ad-seg pending CSR review and transfer. *Id.*

On July 30, 2012, the CSR approved the ICC's recommendation for a 5-month SHU term plus an indeterminate SHU term. Docket No. 79 at 50. Mr. Roberson thus was "endorsed" to the Corcoran SHU to serve an indeterminate SHU term upon expiration of his MERD on the 5-month SHU term. The CSR's note stated: "Inmate has proven to be a threat to the security of the institution as noted in the ICC action of 7-19-12. Please review case within 180 days for consideration of release from SHU." *Id.* The CSR approved Mr. Roberson's retention in ad-seg until his transfer to the Corcoran SHU. *Id.*

### 6.   Inmate Appeal Succeeds In Part

Meanwhile, Mr. Roberson had filed an inmate appeal challenging the June 1 RVR decision. Docket No. 79 at 54. He prevailed at the second level of review. *Id.* at 51. The second level reviewer determined in a decision dated August 3, 2012, that Mr. Roberson had not received all the procedural protections required at his original hearing on June 1 because the hearing officer did not address the evidence Mr. Roberson requested from the IE.

> Therefore, based on the above, the appellant's request for dismissal of the RVR is partially granted; the RVR will be ordered Reissue/Rehear by the Chief Disciplinary Officer (CDO). The appellant's request for release from Administrative Segregation Unit (ASU) must be appealed separately. This appeal (SVSP-L-12-02845) is only addressing the due process/procedural requirements of the RVR. The appellant's request for reversal of the Security Housing Unit (SHU) term is partially granted; after reissue/rehear of the RVR by the CDO, the SHU term assessed for FC12-04-0048 will be vacated. . . . The appellant's request for any other relief is denied; the only relief determined is that the RVR will be reissued/reheard.

Docket No. 79 at 52.

When Mr. Roberson received the decision, he asked a non-defendant correctional counselor what would happen; the non-defendant correctional counselor "indicated that *most likely*

United States District Court
Northern District of California

---

[7] Salinas Valley does not have a SHU.

[Mr. Roberson] would be issued a new CDCR-114D," "*probably* go back to classification committee" to undo the original RVR, and would be issued a new RVR. Docket No. 16 at 8 (emphasis added). Mr. Roberson also spoke to Defendants Hughes and Lopez, who indicated they were working on getting him to a classification committee before his rehearing on the disciplinary charge, but they did not take him to a classification committee. Docket No. 16 at 9.

On August 8, the chief disciplinary officer issued a memorandum ordering that the RVR be reissued and reheard. Docket No. 79 at 58.

Mr. Roberson remained in ad-seg. He did not receive a new CDCR-114D stating the basis for his ad-seg placement or a new ICC hearing. Docket No. 85 at 3.

The RVR charging Mr. Roberson with participating in a riot on April 22, 2012, was reissued on August 14, 2012, by C/O Murphy. Docket No. 79 at 59.

7.    The September 6 Rehearing on the RVR

A new Investigative Employee (IE) was appointed on August 26 for the rehearing on the RVR. The IE report was prepared in August/September and stated that the IE had informed Mr. Roberson that the IE would "act as a fact finder for the Senior Hearing Officer." Docket No. 79 at 65. This IE report stated that Mr. Roberson did not make a statement, did not request any staff or inmate-witnesses be present at the hearing, and did not request that any evidence be produced at the hearing. *Id.* at 68. The IE report further stated that Mr. Roberson asked that eleven inmate-witnesses be asked certain questions. *Id.* at 65. The IE was unable to reach three of the inmate-witnesses and recorded the answers given by the other eight inmate-witnesses. *Id.* at 65-68. Those inmate-witnesses denied fighting with Mr. Roberson and denied that Mr. Roberson was involved in the April 22 riot. *Id.* The IE report also stated that the IE had interviewed C/O Murphy, who stated that, "'[d]uring the riot, Inmate Roberson refused to prone out. He was given several direct orders and failed to comply until multiple O.C. grenades and Direct Impacts were discharged that he moved away and proned out while yelling and making gestures at the fighting inmates.'" *Id.* at 68.

The rehearing took place on September 6, with correctional lieutenant Meredith acting as the senior hearing officer (SHO). Docket No. 71 at 1; Docket No. 79 at 62-64. At the hearing,

9

Mr. Roberson protested that the hearing was "illegal" because he had not received a new CDCR-114D placement order and had not been taken back to the classification committee to have the original RVR vacated; Mr. Roberson also presented the August 8 memorandum ordering that the RVR be reissued and reheard. Docket No. 16 at 11; Docket No. 85 at 3. According to Mr. Roberson, sergeant Lopez made a motion behind Mr. Roberson's back that looked to Mr. Roberson like sergeant Lopez was saying "no," following which lieutenant Meredith said Mr. Roberson was guilty and had correctional officers take Mr. Roberson back to his cell. Docket No. 16 at 11.

According to the report for the rehearing, Mr. Roberson entered a "not guilty" plea to the charges of participating in a riot, and said "'I wasn't there, I was 500 yards away.'" Docket No. 79 at 63. Lieutenant Meredith wrote that Mr. Roberson acknowledged that he had received copies of the RVR and Incident Report more than 24 hours in advance of the hearing, and that these reports as well as C/O Murphy's RVR were reviewed by Mr. Roberson at the hearing. *Id.* Lieutenant Meredith wrote that Roberson did not request that witnesses or evidence be produced for this hearing at the time of the IE report or when he was issued the RVR, but did request a copy of the original IE report (from the original hearing), and it was provided. *Id.* Lieutenant Meredith found Mr. Roberson guilty of "participation in a riot," and wrote:

> The evidence presented at the hearing included:
>
> 1.) Rules Violation Report authored by Correctional Officer D. Murphy, which states in part, "On 4/22/2012 a riot occurred on C yard 1 in which Inmate ROBERSON ran into the scene of an ongoing riot and participated in the fighting. Following the deployment of chemical agents and less-lethal projectiles Inmate ROBERSON separated from the other inmates and got down."
>
> 2.) SHO notes that ROBERSON stated he requested photos of all weapons located on the yard following the riot but it was not reflected in the IE report. SHO denied the request and noted that Inmate ROBERSON was not charged with any weapons related offense and the photos would not provide any material evidence to the hearing.
>
> 3.) Inmate ROBERSON stated he requested photographs of all inmates involved in the riot but it was not reflected in the IE report. He stated the photos were to prove he was not part of the incident. SHO denied the request and noted Inmate ROBERSON was identified by name in the report of Officer D. Murphy as a

> participant in the riot and providing the identification of other
> participants would not provide any material evidence to the hearing.
>
> Based on the aforementioned facts, this SHO finds the
> preponderance of the evidence has been met to render and sustain a
> finding of guilt on the charged offense of violating CCR
> § 3005(d)(3); specifically, "PARTICIPATION IN A RIOT", a
> Division (D) offense CCR § 3323(f)(3).

Docket No. 79 at 64. Lieutenant Meredith assessed a 90-day forfeiture of behavioral credits upon finding Mr. Roberson guilty. *Id.* at 62.

In the ensuing days, Mr. Roberson told Defendant Garcia that he wanted to talk to Defendants Hughes and Lopez about being taken to a classification committee and that it was important that he be taken to a classification committee before being sent from ad-seg to the SHU. Docket No. 16 at 12. Mr. Roberson was told that they were gone, and he did not see them again before he was transferred to the Corcoran SHU. *Id.*

### 8. Mr. Roberson Goes To the Corcoran SHU

On September 11, 2012, Mr. Roberson was transferred to the Corcoran SHU to serve the five-month SHU term followed by the indeterminate SHU term earlier assessed by the ICC on July 19 and approved by the CSR on July 30. (Mr. Roberson received credit toward the SHU term for the time he had been housed in ad-seg at Salinas Valley. As a result, he already was into his indeterminate SHU term when he arrived at the Corcoran SHU because his 5-month SHU term was treated as having finished on August 15, 2012, while he was still in ad-seg.)

On September 19, 2012, Mr. Roberson appeared before the ICC at Corcoran for his initial SHU review. Docket No. 79 at 90. Defendants Sandor and Mascarenas were on that ICC. Mr. Roberson informed the committee that his SHU placement was improper because he had a memorandum order vacating the RVR, apparently referring to the August 8 memorandum ordering that the RVR be reissued and reheard. Docket No. 16 at 14; Docket No. 85 at 6. The ICC noted that Mr. Roberson had been endorsed by the CSR on July 30 to serve an indeterminate SHU term at Corcoran. Docket No. 79 at 90. The ICC elected to retain Mr. Roberson in the SHU on the indeterminate term "due to disciplinary history. Retention in SHU is based on [Mr. Roberson's] release to [general population ] at this time presents an immediate threat to the safety

and security of self/others as well as the security of the institution." *Id.*[8]

On October 31, 2012, Mr. Roberson appeared before the ICC at Corcoran for a "special SHU review." Docket No. 79 at 71. Defendants Sandor and Mascarenas were on that ICC. The ICC noted that Mr. Roberson was endorsed to the Corcoran SHU by the CSR on July 30 to serve an indeterminate SHU term. The ICC noted that the RVR had been reissued and reheard, that Mr. Roberson had been found guilty of participation in a riot at the rehearing, and that the indeterminate SHU term "remains appropriate." *Id.* The ICC vacated the 5-month determinate SHU term that had been assessed on July 19 and recommended instead a 6-month determinate SHU term to be followed by the indeterminate SHU term. *Id.* The ICC report stated that Mr. Roberson's retention in the SHU was based on the fact that his "release to [General Population] at this time presents an immediate threat to the safety and security of self/others as well as the security of the institution." *Id.*

The CSR did not approve the 6-month determinate SHU term recommended by the ICC because there was no explanation as to why a term longer than the original 5-month SHU term should be imposed when the RVR was reheard. *Id.* at 72. The case was sent back to the ICC. *Id.*

On December 5, 2012, the ICC thus convened again, vacated the 6-month SHU term imposed on October 31, and imposed a 5-month determinate SHU term in its place. *Id.* at 73. The ICC also determined to retain Mr. Roberson in the SHU on the indeterminate SHU term because his "release to [General Population] at this time presents an immediate threat to the safety and security of self/others as well as the security of the institution." *Id.* The CSR approved the decision on December 26, 2012. *Id.* at 74.

----

[8] Mr. Roberson states that CCI Mascarenas, who was at the September 19 ICC hearing and typed up the ICC report, falsely wrote that Mr. Roberson had safety concerns. Docket No. 85 at 6. CCI Mascarenas states that she had a conversation with Mr. Roberson after the September 19 ICC hearing, during which Roberson told her she had made a mistake by typing that Mr. Roberson "stated that he does have safety concerns." Docket No. 73 at 4. "When Roberson showed [her] the mistake, [she] immediately fixed it, adding the word 'not' and initialing the document." *Id.* The ICC report comports with CCI Mascarenas' statements: there is a handwritten interlineation of the word "not" so that the sentence on the September 19 ICC report in the file reads that Mr. Roberson "stated he does not have safety concerns." Docket No. 79 at 90. CCI Mascarenas confirms that the electronic copy of the ICC report is now correct. Docket No. 73 at 4. There is no evidence that anything adverse ever occurred as a result of the mistake.

On February 13, 2013, the ICC met again for a 180-day review of Mr. Roberson's placement in the SHU, and determined that he would be released from the indeterminate SHU term effective that day due to him being disciplinary free for a while and maintaining a positive program. *Id.* at 82. The ICC recommended his transfer to a Level IV 180-degree design prison, but that he be retained in ad-seg until his transfer a 180-degree facility because his release to the less restrictive Level IV 270-degree design general population available at Corcoran "at this time presents an immediate threat to the safety and security of self/others as well as the security of the institution." *Id.*

On March 18, 2013, the CSR noted that Mr. Roberson had been released from his indeterminate SHU term and endorsed Mr. Roberson to the California Substance Abuse Treatment Facility-Level IV 180-degree facility. Docket No. 79 at 76. The CSR further approved Mr. Roberson's retention in ad-seg pending the transfer. *Id.*

Inmate movement record show that Mr. Roberson was transferred to the California Substance Abuse Treatment Facility on April 11, 2013. Docket No. 68 at 2, 15.

### III.    VENUE AND JURISDICTION

Venue is proper in the Northern District of California because some of the events or omissions giving rise to the complaint occurred at a prison in Monterey County, which is located within the Northern District. *See* 28 U.S.C. §§ 84, 1391(b). The Court has federal question jurisdiction over this action brought under 42 U.S.C. § 1983. *See* 28 U.S.C. § 1331.

### IV.    LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine dispute as to any material fact and [that] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A fact is material if it might affect the outcome of the lawsuit under governing law, and a dispute about

13

such a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

In a typical summary judgment motion, a defendant moves for judgment against a plaintiff on the merits of his claim. In such a situation, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine dispute of material fact. The burden then shifts to the nonmoving party to "go beyond the pleadings, and by his own affidavits, or by the 'depositions, answers to interrogatories, or admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324.

When a defendant moves for summary judgment on an affirmative defense on which he bears the burden of proof at trial, he must come forward with evidence which would entitle him to a directed verdict if the evidence went uncontroverted at trial. *See Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992).

A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence. *See Schroeder v. McDonald*, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but on his personal knowledge). Mr. Roberson's amended complaint is made under penalty of perjury and therefore is considered as evidence. *See* Docket No. 16 at 21.

The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. *See T.W. Elec. Serv. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The evidence must be viewed in the light most favorable to the nonmoving party, and inferences to be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *See id*. at 631.

## V.     DISCUSSION

A.     Claim 1: Due Process Claims Regarding The September 6, 2012 Rehearing

Mr. Roberson claims that his right to due process was violated by lieutenant Meredith at

the September 6 rehearing on the RVR because there was not sufficient evidence to support the finding of guilt and lieutenant Meredith found him guilty after a correctional sergeant made a motion that Mr. Roberson interpreted to mean "no." In his opposition to the motion for summary judgment, Mr. Roberson adds a claim that his due process rights were violated because lieutenant Meredith failed to address his request for evidence.

The Due Process Clause of the Fourteenth Amendment of the U.S. Constitution protects individuals against governmental deprivations of life, liberty or property without due process of law. Interests that are procedurally protected by the Due Process Clause may arise from two sources: the Due Process Clause itself and laws of the states. *See Meachum v. Fano*, 427 U.S. 215, 224-27 (1976). In the prison context, these interests are generally ones pertaining to liberty. Changes in conditions so severe as to affect the sentence imposed in an unexpected manner implicate the Due Process Clause itself, whether or not they are authorized by state law. *See Sandin v. Conner*, 515 U.S. 472, 484 (1995) (citing *Vitek v. Jones*, 445 U.S. 480, 493 (1980) (transfer to mental hospital), and *Washington v. Harper*, 494 U.S. 210, 221-22 (1990) (involuntary administration of psychotropic drugs)). Deprivations that are less severe or more closely related to the expected terms of confinement may also amount to deprivations of a protected liberty interest, provided that the liberty in question is one of "real substance." *See Sandin*, 515 U.S. at 477-87. An interest of "real substance" will generally be limited to freedom from restraint that imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life" or "will inevitably affect the duration of [a] sentence." *Id.* at 484, 487. The placement of an inmate in a highly restrictive housing setting may amount to a deprivation of a liberty interest of "real substance" within the meaning of *Sandin*. *See Wilkinson v. Austin*, 545 U.S. 209, 224 (2005).

When there is a deprivation of a liberty interest of real substance, the procedural protections to which the prisoner is entitled depend on whether the deprivation results from a disciplinary decision or an administrative decision. If it is a disciplinary decision, such as the September 6 RVR decision, the procedural protections required are: written notice, time to prepare for the hearing, a written statement of decision, allowance of witnesses and documentary evidence

when not unduly hazardous, and aid to the accused where the inmate is illiterate or the issues are complex. *Wolff v. McDonnell*, 418 U.S. 539, 564-67 (1974). The Due Process Clause requires only that prisoners be afforded those procedures mandated by *Wolff* and its progeny; it does not require that prisons comply with their own, more generous procedures. *See Walker v. Sumner*, 14 F.3d 1415, 1419–20 (9th Cir.1994), *overruled on other grounds by Sandin v. Connor*, 515 U.S. 472. A prisoner's right to due process is violated "only if he [is] not provided with process sufficient to meet the *Wolff* standard." *Id.* at 1420.

There also must be some reliable evidence to support the disciplinary decision, *see Superintendent v. Hill*, 472 U.S. 445, 454 (1985); *Cato v. Rushen*, 824 F.2d 703, 704-05 (9th Cir. 1987). "Ascertaining whether [the some evidence] standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached" by the disciplinary hearing officer. *Superintendent v. Hill*, 472 U.S. at 455-56. This standard is considerably lower than that applicable in criminal trials. *See id.* at 456.

Mr. Roberson fails to show a triable issue of fact on his claim that lieutenant Meredith's disciplinary decision on September 6 was not supported by sufficient evidence. The evidence lieutenant Meredith considered at the rehearing included C/O Murphy's RVR report that Roberson ran into the riot and fought with other inmates. *See* Docket 79 at 63. Lieutenant Meredith's decision finding Mr. Roberson guilty of participating in a riot passes the minimally stringent "some evidence" test. There was some reliable evidence to support the disciplinary decision, notwithstanding the existence of evidence that Mr. Roberson had denied involvement and other inmate-witnesses had stated that he was not involved in the fighting. "The Federal Constitution does not require evidence that logically precludes any conclusion but the one reached by the disciplinary board." *Superintendent v. Hill*, 472 U.S. at 457.

At first blush, one might think that Mr. Roberson's denial of responsibility and his evidence that other inmates denied his involvement in the create triable issues of fact here. They do not do so, however, because both the court and a properly-instructed jury in this case would

16

have to apply the same rule from *Superintendent v. Hill* to determine whether there was a due process violation.  The question for the court -- or for a jury -- is not whether Mr. Roberson was guilty of the offense; instead, the question is whether there was some evidence to support lieutenant Meredith's decision.  The reviewing court (or a jury considering such a claim) cannot reweigh the evidence but instead must consider only whether there was some evidence in the record to support the prison hearing officer's conclusion.  *Superintendent v. Hill* does not permit such a re-weighing of the evidence by the court or by a jury.  Instead, the decision is upheld if "there is any evidence in the record that could support the conclusion reached by the disciplinary board."  *Id.* at 455-56.  On the evidence in the record before this Court, no reasonable juror could find that there was not some evidence to support the September 6 disciplinary decision.

Mr. Roberson also claims that his right to due process was violated because lieutenant Meredith found him guilty and ended the hearing after a correctional sergeant made a motion behind his back that Mr. Roberson interpreted to mean "no."  The correctional sergeant and lieutenant Meredith deny that this motion was made.  The dispute of fact is not material a gesture made by a staff member during a hearing would not violate *Wolff*.  Mr. Roberson was given an adequate opportunity to be heard and there was some evidence to support the ruling.

Mr. Roberson urges, that if he had been given an opportunity, he could have presented the CDCR-812[9] showing that a correctional officer removed Brown, Davis, and Richardson from Mr. Roberson's list of enemies on April 23, 2012, and that evidence (i.e., their removal from the list) would have shown that he did not fight with those three inmates during the riot, contrary to C/O Murphy's statement in the RVR.  *See* Docket No. 85 at 4.  But Mr. Roberson misreads the CDCR-812: that form shows that those three inmates were *added* to the list of Mr. Roberson's non-confidential enemies list rather than deleted from it.  Docket No. 16 at 27.

Mr. Roberson also urges that he could have submitted medical reports and incident reports, although there is no evidence that the hearing officer did not already have those documents;

---

[9] A CDCR-812 is the form number for a document labeled "Notice of Critical Case Information – Safety of Persons (Non-Confidential Enemies).  *See* Docket No. 16 at 27.  The form has a section for "non-confidential enemies" and a section for "deletion of prior enemies" on which other inmates' names and information may be entered by staff.

indeed, copies were reviewed by Mr. Roberson in the hearing.  Mr. Roberson urges that the

medical reports showed that he did not have any injuries, blood, or pepper-spray on him, and this

would have undermined C/O Murphy's report that Mr. Roberson was involved.  Docket No. 85 at

4; *see* Docket No. 16-2 at 10; Docket No. 16-3 at 1.  But many of the other participants in the riot

also did not have injuries or pepper-spray on them, according to their medical reports.  *See* Docket

No. 16-3 at 6-11, 16-20, 24-27.  Mr. Roberson also wanted to show that other correctional officers

did not mention him in their reports about the riot.  The medical reports and the other correctional

officers' reports were available to hearing officer Meredith, and the hearing report states that the

RVR (i.e., C/O Murphy's report describing Mr. Roberson's specific acts) and Incident Log

Number SVSP-FY-12-04-0356 (i.e., the aggregation of reports about the overall riot) were made

available before the hearing and "were reviewed by Inmate Roberson in the hearing."  Docket No.

79 at 63.  Insofar as Mr. Roberson wanted to argue about the inferences to be drawn from the

evidence, *Wolff* does not require that the inmate be allowed to make arguments from the evidence.

In his opposition to the motion for summary judgment, Mr. Roberson claims that his

request for evidence was not adequately addressed by lieutenant Meredith.  The evidence is

undisputed that: (1) the IE report for the rehearing stated that Mr. Roberson did not request any

evidence; (2) lieutenant Meredith wrote in the rehearing decision that the IE report for the

rehearing did not include any request by Mr. Roberson for evidence; (3) lieutenant Meredith

addressed Mr. Roberson's photo requests made at the hearing – denying the request for photos of

all inmates involved in the riot because C/O Murphy had identified Mr. Roberson by name as a

participant and the identities of other participants was immaterial to Mr. Roberson's guilt or

innocence, and denying the request for photos of weapons as irrelevant in that Roberson "was not

charged with any weapons related offense."  Docket No. 79 at 64.  Hearing officer Meredith did

not mention the request for "camera footage" that Mr. Roberson had asked the IE for before the

original hearing.  But Mr. Roberson does not think there is any camera footage and presents no

evidence that there is camera footage of the riot.  Indeed, he stated under penalty of perjury: "As

prison officials admit, the incident was not captured on camera.  Officials acknowledge the camera

system was not working."  Docket No. 1 at 6.  If video footage did not exist – as Mr. Roberson

indicates was the case – no reasonable jury could find a violation of his right to present such evidence. Moreover, even if there was video footage, Mr. Roberson had not asked the IE to gather it for the rehearing. Although an inmate has the right under *Wolff* to present documentary evidence in support of his defense, that right is limited by correctional and institutional concerns. *See Wolff*, 418 U.S. at 566. A legitimate correctional concern is the prompt resolution of disciplinary charges. *See generally id.* ("Prison officials must have the necessary discretion to keep the hearing within reasonable limits"). Thus, while *Wolff* requires that an inmate be allowed to present evidence, it does not command that he be allowed unlimited time in which to do so or to spring a request at the rehearing that the hearing officer consider evidence not already gathered. On the evidence in the record, no reasonable jury could find that there was a violation of the *Wolff* requirement that the inmate be allowed to present documentary evidence in his defense.

On the evidence in the record, no reasonable jury could find in Mr. Roberson's favor on his due process claims against lieutenant Meredith based on the September 6, 2012 rehearing. Lieutenant Meredith thus is entitled to judgment as a matter of law in his favor.

B.    Claims 2 and 3:  Due Process Claims Based On The Failure To Prevent Mr. Roberson's Transfer To, and Retention In, the Corcoran SHU

The center of this action is Mr. Roberson's contention that he should not have been sent to the SHU because the original disciplinary decision had been set aside. Mr. Roberson's theory of a constitutional violation is based on the sequence of events. The pertinent dates in 2012 are these:

| Date | Event |
|---|---|
| June 1 | RVR hearing, at which Roberson is found guilty. |
| July 19 | ICC hearing, at which 5-month SHU term is assessed for the RVR, indeterminate SHU term is assessed for disruptive behavior, and transfer to Corcoran SHU is recommended. |
| August 3 | Inmate appeal is granted in part: RVR is vacated and must be reissued and reheard. |
| August 14 | RVR is reissued. |
| August 22 | 5-month SHU term expires; Roberson remains in ad-seg. |

September 6  RVR rehearing, at which Roberson is again found
guilty and assessed a 90-day loss of credits.

September 11  Roberson is transferred to Corcoran SHU

Mr. Roberson's theory is that the July 19 SHU placement decision, which flowed from the disciplinary offense, had to be vacated when the June 1 disciplinary decision was vacated even though he later was found guilty at a rehearing on September 6, days before he actually was sent to the SHU. Relying on that theory, he claims that Defendants violated his right to due process by not preventing his transfer to the SHU on September 11 and not removing him from the SHU once he got there. His claims find little support in the case law. Hence, qualified immunity must be considered.

### 1. Qualified Immunity Standards

The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).[10] The doctrine of qualified immunity attempts to balance two important and sometimes competing interests: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The doctrine thus intends to take into account the real-world demands on officials in order to allow them to act "swiftly and firmly" in situations where the rules governing their actions are often "voluminous, ambiguous, and contradictory." *Mueller v. Auker*, 576 F.3d 979, 993 (9th Cir. 2009) (citation omitted).

To determine whether a government official is entitled to qualified immunity, courts must

---

[10] Mr. Roberson argues that Defendants are not entitled to qualified immunity because they "are not government officials. They are all state actors under the color of state law." Docket No. 84 at 41. He misunderstands the law. Defendants are government officials covered by the doctrine of qualified immunity because they are state actors who were serving a governmental purpose, i.e., they were state prison employees serving the governmental goal of managing prisoners at the prisons at which they worked. *Cf. Bracken v. Okura*, 869 F.3d 771, 776 (9th Cir. 2017) (qualified immunity would not be available when a government officer uses the badge of his authority in service of a private non-governmental goal).

United States District Court
Northern District of California

consider (1) whether the official's conduct violated a constitutional right, and (2) whether that right was "clearly established" at the time of the alleged misconduct. *Pearson*, 555 U.S. at 232. Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id*. at 236.

"An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in [his] shoes would have understood that he was violating it, meaning that existing precedent . . . placed the statutory or constitutional question beyond debate." *City and County of San Francisco, Cal. v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) (alteration and omission in original; citation omitted). *See, e.g., Carroll v. Carman*, 135 S. Ct. 348, 350 (2014) (citations omitted) (law not clearly established whether officer may conduct a 'knock and talk' at any entrance to a home that is open to visitors, rather than only the front door); *Hines v. Youseff*, 914 F.3d 1218, 1229 (9th Cir. 2019) (defendants entitled to qualified immunity where "the specific right that the inmates claim in these cases—the right to be free from heightened exposure to Valley Fever spores—was not clearly established at the time"); *Horton v. City of Santa Maria*, 915 F.3d 592, 600-01 (9th Cir. 2019) (officer entitled to qualified immunity on failure-to-protect claim from pretrial detainee who attempted to hang himself because there was conflicting information as to whether he was suicidal and the case law "was simply too sparse, and involved circumstances too distinct from those in this case, to establish that a reasonable officer would perceive a substantial risk that [detainee] would imminently attempt suicide"). The plaintiff "'bears the burden of showing that the right at issue was clearly established.'" *Emmons v. City of Escondido*, 921 F.3d 1172, 1174 (9th Cir. 2019).

The Supreme Court "has repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam) (officer entitled to qualified immunity for shooting a woman who was armed with a large knife, was ignoring officers' orders to drop the weapon, and was within striking distance of her housemate; prior cases on excessive force did not clearly establish that it was unlawful to use force under these circumstances where officer may not have been in apparent

danger but believed woman was a threat to her housemate); *Mullenix v. Luna*, 136 S. Ct. 305, 308-312 (2015) (officer entitled to qualified immunity for firing at fleeing suspect in high speed car chase who had threatened to shoot officers involved in his pursuit because it was not clearly established that Fourth Amendment prohibited officer's conduct in the situation she confronted; rejecting as too broad and general circuit's Fourth Amendment formulation that officer may not use deadly force against a fleeing felon who does not pose a sufficient threat of harm to the officers or others); *Sheehan*, 135 S. Ct. at 1768 (officers entitled to qualified immunity because the general Fourth Amendment "objective reasonableness" standard for excessive force was too general and there was no clearly established law regarding whether the officers' failure to accommodate or consider that the suspect was mentally ill violated the Constitution).

    2.    <u>The Claimed Right Is Not A "Clearly Established Right"</u>

        a.    <u>Procedural Protections For Segregated Housing Placement/Retention</u>

As mentioned earlier in this order, the federal right to due process does not require a state prison to comply with its own procedures that might be more generous than those federally required. *See Walker*, 14 F.3d at 1419-20. In other words, "'if state procedures rise above the floor set by the due process clause, a state could fail to follow its own procedures yet still provide sufficient process to survive constitutional scrutiny.'" *Id.* at 1420 (quoting *Rogers v. Okin*, 738 F.2d 1, 8 (1st Cir. 1984)). This point is critical, because it shows the futility of most of Mr. Roberson's argument. He argues repeatedly about procedures that supposedly were required by the CDCR's Department Operations Manual and the California Code of Regulations. Although those rules and regulations might help one understand how the disciplinary and classification procedures operated, they are basically beside the point when it comes to figuring out what is required to satisfy the federal constitution's right to due process. Instead, this Court must focus on caselaw applying the constitution to understand the procedural requirements necessary to satisfy the federal right to due process.

The federal right to due process is a procedural right with respect to placement in disciplinary segregation or administrative segregation when such placement deprives the inmate of a liberty interest of "real substance." *See Sandin*, 515 U.S. at 477-87. As mentioned earlier, the

protections required by due process for disciplinary segregation are: written notice, time to prepare for the hearing, a written statement of decision, allowance of witnesses and documentary evidence when not unduly hazardous, and aid to the accused where the inmate is illiterate or the issues are complex. *Wolff*, 418 U.S. at 564-67. There also must be some reliable evidence to support the disciplinary decision, *see Superintendent v. Hill*, 472 U.S. at 454; *Cato v. Rushen*, 824 F.2d at 704-05.

"[A] lesser quantum of process is due when a prisoner is placed in administrative segregation than is required by *Wolff*." *See Toussaint v. McCarthy*, 801 F.2d 1080, 1099 (9th Cir. 1986) (citing *Hewitt v. Helms*, 459 U.S. 460, 476 (1983)). For an administrative decision, due process requires that prison officials hold an informal nonadversary hearing within a reasonable time after the prisoner is segregated, inform the prisoner of the reason segregation is being considered, and allow the prisoner to present his views. *Toussaint*, 801 F.2d at 1100, 1104-05. There also must be some evidence to support the prison officials' decision. *Superintendent v. Hill*, 472 U.S. at 455.

During the relevant time period in 2012-2013, the law was not clearly established that periodic review of an inmate's confinement in segregated housing was constitutionally necessary. *Brown v. Oregon Dept. of Corr.*, 751 F.3d 983, 989 (9th Cir. 2014). In *Brown*, which was decided on April 24, 2014, the Ninth Circuit determined that prison officials were entitled to qualified immunity against a prisoner's claim that his right to due process was violated by his 27-month placement in an intensive management unit without meaningful post-placement periodic reviews. *See id.* at 989-90 ("Although we conclude that a lengthy confinement without meaningful review may constitute atypical and significant hardship, our case law has not previously so held, and we cannot hold defendants liable for the violation of a right that was not clearly established at the time the violation occurred.")

The one case the Court has located that has some similar facts to Mr. Roberson also has some critical facts that distinguish it and render it of little applicability in deciding the specific question presented here. In *Jackson v. Carey*, 353 F.3d 750 (9th Cir. 2003), the plaintiff served a determinate SHU term based on a disciplinary decision that had been vacated *but never reheard*.

There, a 1-year SHU term was assessed after he was found guilty of a disciplinary offense. The disciplinary decision was vacated and ordered reheard, *id.* at 753, but the RVR was never reissued or reheard and the inmate was nonetheless sent to the SHU. *Id.* at 753-54. At the time of the inmate's transfer to the SHU in *Jackson*, there was no extant guilty finding to support the SHU term. *Id.* at 754. *Jackson* held that the complaint adequately alleged a due process claim that the plaintiff had been subjected to an atypical and significant hardship without due process because the rehearing never took place and there was no finding of guilt. *See id.* at 756-57. *Jackson* does not provide the clearly established law that governs the issue presented in the present case because, unlike the plaintiff in *Jackson*, Mr. Roberson *did* have a rehearing and *had been* found guilty before he entered the SHU and while he remained there.

Neither *Wolff* nor *Toussaint,* nor any of the related cases, say anything about what must occur regarding an indeterminate SHU term after a related disciplinary decision is set aside. The cases do not hold that prison officials may not send an inmate to serve an indeterminate SHU term after a related disciplinary decision is vacated, reheard, and results in a new finding of guilt. The Court thus concludes that *Wolff* and *Toussaint* do not provide a "clearly established right" to avoid placement in the SHU under the circumstances present here. The Court thus must look elsewhere to search for such a "clearly established right," if one even exists.

      b.   <u>Wrongful-detention cases</u>

In the order of service, the Court relied on wrongful-detention cases to determine that a cognizable due process claim had been pled by Mr. Roberson.

> "A wrongful detention can ripen into a due process violation if 'it was or should have been known [by the defendant] that the [plaintiff] was entitled to release.'" *Gant v. County of Los Angeles*, 772 F.3d 608, 620 (9th Cir. 2014); *see e.g., id.* at 622-23 (arrestee detained on a warrant meant for another man with same name plausibly alleged a due process violation by County which should have known he was not the person for whom warrant was intended); *Garcia v. County of Riverside*, 817 F.3d 635, 640 (9th Cir. 2016) (allowing due process claim for excessive detention based on law enforcement's failure to investigate an arrestee's claim of mistaken identity).

> Mr. Roberson alleges that some Defendants failed to prevent his transfer to the Corcoran SHU where he would have to serve the SHU term that should have been vacated when the underlying

24

> disciplinary decision was set aside, and some other Defendants at the Corcoran SHU failed to release him from the SHU when he alerted them that his SHU term should have been vacated when the underlying disciplinary decision was set aside. Giving the *pro se* amended complaint the liberal construction to which it is entitled, a cognizable due process claim is stated.

Docket No. 17 at 3-4.

Although those wrongful-detention cases were sufficient to allow Mr. Roberson's claims to get past the screening stage of the action, they do not provide a "clearly established right" such that Defendants can be held liable in damages under the under the circumstances of this case. The *Gant* and *Garcia* cases do not help Mr. Roberson avoid summary judgment on the qualified immunity defense because they are factually distinguishable in important respects. Both *Gant* and *Garcia* are arrestee cases, not cases involving someone already in prison, and both were cases of mistaken identity -- police had arrested the wrong man in each case. More importantly, the plaintiffs in *Gant* and *Garcia were* entitled to release from custody because they should not have been arrested, whereas Mr. Roberson's claimed entitlement to avoid being sent to the SHU was at best arguable. *Cf. Rivera v. County of Los Angeles*, 745 F.3d 384, 390-91 (9th Cir. 2014) (rejecting wrongful-detention claim where there was a mistaken identity, but the arrestee closely resembled the warrant subject and deputies reasonably concluded that he was the true warrant subject); *id.* at 391-92 ("Unsupported claims of mistaken identity, by themselves, do not trigger a duty to investigate further.").

*Gant*, *Garcia*, and *Rivera* do not provide a clearly established right to avoid placement in the SHU when the indeterminate SHU term is based on a disciplinary decision that has been vacated but reheard and resulted in a guilty finding. These wrongful-detention cases which do not involve placement of inmates in any kind of SHU did not "place the statutory or constitutional question [in this case] beyond debate." *Sheehan*, 135 S. Ct. at 1774.

####          c.    Other cases

Mr. Roberson has not identified, nor has the Court found, any case that discusses or holds that prison officials must vacate or otherwise set aside an indeterminate SHU term after a related disciplinary decision is set aside pending rehearing. Likewise, no case has been found holding that an inmate may not be placed in a SHU to serve an indeterminate term when a related

1  disciplinary decision has been vacated, reheard, and resulted in a guilty finding at the rehearing.

2  On the other hand, the Court has found a few cases that, by analogy, support the view that

3  Defendant prison officials could have reasonably believed their actions lawful.

4      One such case is *Griffin v. Gomez*, 741 F.3d 10 (9th Cir. 2014), which criticized a district

5  court for *failing* to consider intervening events when the district court commanded compliance

6  with an order.  In *Griffin*, the Ninth Circuit held that the district court abused its discretion in

7  ordering prison officials to comply with a 3-year old order to release a prisoner from the SHU

8  where intervening events (after that 3-year old order issued but before the district court ordered

9  compliance with it several years later) showed that the prisoner actually belonged in the SHU.[11]

10  Prison officials reading the *Griffin* case reasonably could have understood that Mr. Roberson's

11  SHU placement was lawful based on the fact that the vacation of the original RVR decision was

12  on procedural grounds and the fact that Mr. Roberson had been found guilty again at the rehearing

13  on the RVR before he was sent to the SHU.  *Cf. Gikas v. Zolin*, 6 Cal. 4th 841, 852-57 (Cal. 1993)

14  (although "acquittal" in criminal case requires immediate reinstatement of a license that has been

15  suspended by the DMV for drunk driving, a person is "acquitted" within the meaning of the statute

16  only if the trial court's ruling rules in driver's favor on one or more of the factual elements of the

17  crime; a dismissal based on a suppression motion is not an acquittal).

18      Mr. Roberson's due process claims regarding his SHU terms rests on the premise that the

19  SHU terms, which flowed from the disciplinary offense, had to be vacated when the disciplinary

20  decision was vacated.  Mr. Roberson has not identified any case that is even close to being

21

22  [11] In *Griffin v.* Gomez, the district court ordered in 2006 that the prisoner be released from the
Pelican Bay SHU after concluding that his indefinite retention there as a gang member was
23  unconstitutional because there was no current evidence of continued gang activity. 741 F.3d at 14.
Before that 2006 order issued, the prisoner had been sent to federal custody to face trial as "a
24  defendant in a massive federal RICO case" premised on his activities in the prison gang.  After he
was convicted in 2007 in the federal case of conspiring to engage in multiple murders on behalf of
25  his gang, the prisoner was returned to state custody and put in the Pelican Bay ad-seg unit for an
investigation of his gang status. *Id.* at 15-16.  The prisoner moved to enforce the 2006 order that
26  he be released from the SHU; the district court granted the motion. *Id.*  The Ninth Circuit strongly
criticized the district court for failing to take into account the changed intervening circumstances –
27  i.e., that the prisoner had been convicted of conspiracy to commit several murders on behalf of the
gang after the district court had ordered his release from the SHU for gang inactivity in 2006 –
28  when the district court twice (in 2009 and again in 2011) ordered prison officials to comply with
the 2006 order to release the prisoner.  *See id.* at 18-20.

United States District Court
Northern District of California

controlling authority on the question of whether the federal right to due process requires that an administrative placement decision be vacated when prison officials order a do-over of a related disciplinary charge.  In short, even assuming arguendo that there is a right to have a SHU term vacated when the related disciplinary decision is set aside, "the right's contours were not sufficiently definite that any reasonable official in [Defendants'] shoes would have understood that [they were] violating it."  *Sheehan*, 135 S. Ct. at 1774.  Similarly, he has not identified any case that is even close to holding that the federal right to due process prohibits an inmate's placement and retention in the SHU when the indeterminate SHU term is related to a disciplinary decision that has been vacated, reheard, and resulted in a new guilty finding.  Defendants therefore are entitled to qualified immunity on Mr. Roberson's claims that his right to due process was violated when Defendants failed to prevent his transfer to the SHU and failed to remove him from the SHU.

## VI.  CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is **GRANTED.** Docket No. 64.  Defendant Meredith is entitled to judgment as a matter of law in his favor on the merits of Mr. Roberson's due process claim against him.  All other defendants are entitled to judgment as a matter of law in their favor on the basis of qualified immunity.  The clerk shall enter judgment and close the file.

**IT IS SO ORDERED**.

Dated: July 9, 2019

_____
EDWARD M. CHEN
United States District Judge